**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**In re:**                                                   **CASE NO. 6:15-bk-03459-CCJ**

**TIRECO, INC.,**                                   **CHAPTER 11**

                                    **Debtor.**
_____/


## DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 FOR TIRECO, INC.


COUNSEL FOR DEBTOR

JUSTIN M. LUNA, ESQ.
CHRISTOPHER R. THOMPSON, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
111 N. MAGNOLIA AVE., SUITE 1400
ORLANDO, FLORIDA 32801


June 16, 2015

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                                    **CASE NO. 6:15-bk-03459-CCJ**

**TIRECO, INC.,**                                   **CHAPTER 11**

              **Debtor.**

_____/

## DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 FOR TIRECO, INC.

### I.   INTRODUCTION AND SUMMARY

This Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of § 1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned bankruptcy case (the "Bankruptcy Case") to make informed judgments about the Plan of Reorganization (the "Plan") submitted by Tireco, Inc. ("Debtor"). The Debtor is soliciting votes to accept the Plan. The overall purpose of the Plan is to provide for the restructuring of the Debtor's liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtor believes the Plan provides the best means currently available for its emergence from Chapter 11 and the best recoveries possible for holders of claims and interests against the Debtor, and thus strongly recommends that you vote to accept the Plan.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN.  THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.  ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  ANY REPRESENTATIONS OR INDUCEMENTS MADE THAT ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT.  FOR THAT REASON, AND DUE TO THE COMPLEXITY OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF

**ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.**

> **THE PLAN PROVIDES FOR INJUNCTIVE RELIEF TO PROTECT CERTAIN PERSONS WHO ARE (1) PROVIDING CONSIDERATION TO THE ESTATE AND REORGANIZED DEBTOR, AND (2) CRITICAL TO THE EXECUTION OF THE REORGANIZATION PLAN DETAILED HEREIN. THE PERSONS SO PROTECTED, AND THE SCOPE OF THE INJUNCTION, ARE DEFINED IN ARTICLE VIII OF THE PLAN AND ARTICLE V HEREOF. IF THE PLAN IS CONFIRMED THE PERSONS SPECIFIED IN THESE PROVISIONS OF THE PLAN WILL NOT BE RELEASED FROM THE CLAIMS OF THE DEBTOR AND ANY CREDITOR AND PARTY IN INTEREST IN THIS CASE.**

As prescribed by the Code and the Federal Rules of Bankruptcy Procedure, the Plan places into "Classes" all Claims asserted against, and equity Interests in, the Debtor. The Plan designates six (6) separate classes of Claims and Interests. As explained in detail below, the Plan generally contemplates paying Holders of Allowed Secured Claims in full over time, and paying Holders of Allowed Unsecured Claims through quarterly payments for 48-months under the Cash Flow Note (as defined below and in the Plan). The Plan also provides that the Debtor's stock and equitable interests will be retained by the existing Interest holders.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtor is altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired," and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is _____, **2015**.
All votes must be received by the voting agent by 5:00 p.m. (EST) on that day.

---

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration.  As described in greater detail in Section VI of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan.  The Bankruptcy Court shall schedule a hearing to consider whether the Debtor has complied with those requirements (the "Confirmation Hearing").

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan.  Confirmation of a plan over the objection of a Class is sometimes called "cramdown."  As described in greater detail in Section VI of this Disclosure Statement, the Debtor has expressly reserved the right to seek cramdown in the event all Impaired Classes do not vote in favor of the Plan.

## II.   <u>DESCRIPTION OF THE DEBTOR'S BUSINESS</u>

The Debtor is single shareholder Florida corporation formed in July 1997.  The Debtor was formed to own and operate an automotive tire service and repair center.  The Debtor does business as "Formula Tire and Auto Care" as its registered fictitious name.   The Debtor currently does business at 2600 West State Road 434, Longwood, Florida 32779 (the "Retail Store").  The Retail Store has eight (8) service bays with electronic lifts and state of the art repair equipment.  The Retail Store services a wide range of automobiles and light trucks.  A significant amount of its revenue comes

from the sale of name brand automotive tires and parts including, but not limited to, Goodyear, Mobil1, BFGoodrich, Firestone, Bridgestone, and Michelin. The Debtor also owns the real property where the Retail Store is located (the "Real Property"). Since March 2004, J. Michael Jones ("Mr. Jones") has been the sole shareholder of the Debtor.

### III.    EVENTS LEADING TO AND SUBSEQUENT TO FILING BANKRUPTCY

A.    Events Leading to Bankruptcy.

From its inception in 1997 until approximately 2013, the Debtor had a successful and thriving business. Annual sales exceeded $1,600,000.00 and the Debtor made every required loan payment to TD Bank and SunTrust, its secured lenders.

In March 2004, to assist with the refinance of the Real Property, the Debtor took out a loan with Mercantile Bank n/k/a TD Bank in the amount of $940,334.00 (the "Note"). The Note is secured by a first priority mortgage lien on the Real Property and security interest lien on substantially all of the Debtor's personal property including equipment, inventory and accounts receivable. The Note was subsequently modified and amended for the benefit of the Debtor and TD Bank.

In September 2005, to ensure the continued growth of the Debtor's business and to acquire certain equipment and inventory, the Debtor took out a line of credit with SunTrust Bank in the amounts of $100,000.00 (the "SunTrust Loan"). The SunTrust Loan may be secured by a first priority lien on all of the Debtor's personal property, including equipment, inventory and accounts receivable.

During this same period of time, the Debtor was working with Firestone/Bridgestone as an authorized retailer. Firestone extended a revolving line of credit from to the Debtor for the

financing of the acquisition of certain Firestone/Bridgestone products. The Debtor incurred a balance in excess of $300,000.00 on this credit line. In late 2012 and early 2013, Firestone advised that the Firestone credit line would be closed with no exception, even though the Debtor no longer was ordering Firestone/Bridgestone products through the line of credit. Firestone demanded that the Debtor pay in excess of $7,500.00 a month or more to pay down the credit line (which was now closed). The Debtor ultimately acceded to the Firestone demand, and began to pay down the antecedent debt owed to Firestone. The mechanism for repayment was through payments the Debtor received from Firestone credit cards and national accounts, which Firestone would automatically credit towards the Debtor's outstanding balance, rather than reimburse the Debtor with cash. This resulted caused a significant drop in the Debtor's cash flow by close to Two Hundred Thousand Dollars ($200,000.00).

Further impacting the Debtor's business, the TD Bank Note became due and payable in June 2013. In October 2013, TD Bank made a demand for payment of the Note in full. The Debtor attempted to refinance the Real Property in an effort to satisfy the Note, but such attempts fell short, largely due to the cash flow crunch caused by Firestone's payment arrangement. Then, on July 21, 2014, TD Bank filed an action against the Debtor for foreclosure of mortgage, foreclosure of security interests and damages in the case styled *TD Bank, N.A. v. Tireco, Inc., et al.*, Case No. 2014-CA-002097-14C-W, in the Circuit Court of the Eighteenth Judicial Circuit, in and for Seminole County, Florida (the "Lawsuit").

Since the filing of the Lawsuit, TD Bank and the Debtor have entered into a certain Forbearance Term Sheet and Restructuring Support Agreement (the "Restructuring Support Agreement"), the terms of which are, in part, the basis for the Plan.

B.     Events Subsequent to Chapter 11 Filing.

On April 21, 2015 (the "Petition Date"), the Debtor filed its Chapter 11 petition initiating the above-captioned bankruptcy case.  Since the Petition Date, the Debtor has continued to operate its business as a debtor-in-possession under §§ 1107(a) and 1108 of the Code (Doc. No. 14).  The Debtor filed three emergency motions shortly after the Petition Date.  First, the Debtor filed its Emergency Motion for Authority to Pay Prepetition Compensation and Benefits, seeking authority to pay the pre-petition wages and benefits of its non-affiliate employees (Doc. No. 4).  Second, the Debtor filed its Motion for Authority to Pay Affiliate and Insider Officers' Salaries *Nunc Pro Tunc* to the Petition Date, seeking authority to pay Mr. Jones and his wife, Monica S. Jones ("Mrs. Jones"), their normal salaries during the course of the bankruptcy case (Doc. No. 5).  Third, the Debtor filed its Motion for Authority to Use Cash Collateral of SunTrust Bank (Doc. No. 6).  On April 23, 2014, the Bankruptcy Court held an emergency preliminary hearing on the three foregoing Motions, and granted the requested relief as to each such Motion (Doc. Nos. 25, 33, and 34).

Additionally, on April 24, 2015, the Debtor filed its unopposed Motion for Authority to Use Cash Collateral of TD Bank (Doc. No. 16), which was filed on a non-emergency basis in light of the agreement of TD Bank to the relief requested.  On May 14, 2015, the Bankruptcy Court considered and granted on an interim basis the TD Bank Cash Collateral Motion through May 28, 2015 (Doc. No. 39).  The Debtor has also filed its Application to Employ Justin M. Luna and the Law Firm of Latham, Shuker, Eden & Beaudine, LLP as Debtor's counsel (Doc. Nos. 27).

On May 11, 2015, the Debtor filed its Schedules (Doc. No. 36) and Statement of Financial Affairs (Doc. No. 37).  On May 18, 2015, the United States Trustee conducted and concluded the 341 meeting of creditors.  No creditors' committee has been appointed.

IV.    **THE PLAN**

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTOR'S PLAN.  ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN.  THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.    Overview.

All Claims against the Debtor shall be classified and treated pursuant to the terms of the Plan.  The Plan contains six (6) Classes of Claims and Interests. There are four (4) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one (1) Class of Equity Interests.  The Plan contemplates paying Allowed Secured Claims in full, either over time, on the Effective Date, or in the ordinary course of business pursuant to applicable state law, as set forth below.  All holders of Allowed Unsecured Claims will receive quarterly payments for a period of 48 months under the Cash Flow Note, as defined below and in the Plan.  Holders of Allowed Equity Interests in the Debtor will retain their interest to the same extent existing as of the Petition Date.  The Plan further provides the respective Holders of Allowed Administrative Claims and Allowed Priority Tax Claims will be paid in full on the Effective Date.

B.    Classification and Treatment of Claims.

1.    Priority Claims.

a.    Administrative Expense Claims.

Holders of all Allowed Administrative Expense Claims of the Debtor shall be paid in full on the Effective Date, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Bankruptcy Court.  However, nothing in this provision of the Plan shall preclude the Reorganized

Debtor from paying any holder of a Nonordinary Course Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date, provided that such Claim Holder consents to different payment terms.  The Allowed Administrative Claims shall be paid from cash on hand or through pre-petition retainers.   The Debtor estimates Administrative Claims to be approximately $35,000.00 (without deducting pre-petition retainers).

        b.     <u>Priority Tax Claims</u>.

Except to the extent that the Holder and the Debtor have agreed or may agree to a different treatment, in full satisfaction of each Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be paid in full through equal monthly payments of principal and interest, with interest paid and accrued at the fixed rate of 4.25% per annum, with such payments ending on the date that is 60 months after the Petition Date.  The filed amount of Priority Tax Claims is currently $9,736.91.  The Debtor estimates the Allowed Amount of such Priority Tax Claims will not exceed $8,070.34.

        2.     <u>Secured Claims</u>.

        a.     <u>Class 1 – Seminole County Tax Collector (2015 Tangible Property Taxes)</u>.

Class 1 consists of the Allowed Secured Claim of the Seminole County Tax Collector for the tangible property taxes assessed on the Debtor's personal property for the 2015 tax year, which taxes are not yet due.  The Class 1 Claim is secured by a statutory lien on the Debtor's personal property and equipment.  In full satisfaction of its Class 1 Allowed Secured Claim, the Debtor shall pay the Class 1 Claim in full when such becomes due and owing in the ordinary course of business under Florida law.  The Seminole County Tax Collector shall retain its statutory lien and all rights under Florida law related to its Class 1 Claim.  Class 1 is Unimpaired.

        b.        <u>Class 2 – Seminole County Tax Collector (2015 Real Property Taxes)</u>.

Class 2 consists of the Allowed Secured Claim of the Seminole County Tax Collector for the real property taxes due on the Real Property for the 2015 tax year, which taxes are not yet due. The Class 2 Claim is secured by a statutory lien on the Real Property. In full satisfaction of its Class 2 Allowed Secured Claim, the Debtor shall pay the Class 2 Claim in full when such becomes due and owing in the ordinary course of business under Florida law. The Seminole County Tax Collector shall retain its statutory lien and all rights under Florida law related to its Class 2 Claim. Class 2 is Unimpaired.

        c.        <u>Class 3 – SunTrust Bank</u>.

Class 3 consists of the Allowed Secured Claim of SunTrust Bank that is secured by a lien on the Debtor's personal property and equipment. In full satisfaction of its Class 3 Allowed Secured Claim, SunTrust shall receive monthly payments of principal and interest based on a fixed 4.25% per annum rate of interest, amortized over 25 years, with a maturity date 60 months after the Effective Date. SunTrust shall retain its lien on the personal property and equipment to the same extent and priority existing as of the Petition Date. Class 3 is Impaired.

        d.        <u>Class 4 – TD Bank</u>.

Class 4 consists of the Allowed Secured Claim of TD Bank, which amount shall be equal to the full amount of its filed proof of claim, and such amounts allowed pursuant to § 506(b) of the Bankruptcy Code, less the application of adequate protection payments made towards outstanding principal and interest during the pendency of the Bankruptcy Case, as agreed to by the Debtor and TD Bank in the Restructuring Support Agreement. The Class 4 Claim is

secured by a first priority mortgage lien and security interest in the Real Property, and a second priority security interest in the Debtor's personal property and equipment.

In full satisfaction of its Class 4 Allowed Secured Claim, TD Bank shall retain its liens on the Real Property and personal property to the same extent and priority existing as of the Petition Date, and beginning on the Effective Date shall receive monthly installments of principal and interest over a three (3) year term with interest accruing and paid at the fixed rate of 4.25%. For the first 24 months after the Effective Date, monthly payments shall be based on a 20 year amortization schedule; and for the final 12 months, on a 15 year amortization schedule. At the end of the three (3) year term, the Class 4 Claim shall mature and be payable in full.

On or before the Effective Date, the Debtor shall execute such loan documents as TD Bank deems reasonably necessary to amend, restate, or modify the terms of the existing promissory note consistent with the Plan and the Restructuring Support Agreement. Such documents shall include, without limitation, a modified, restated, and renewal promissory note which shall include a principal balance equal to the amount of its Allowed Class 4 Claim (the "Renewal Note"), which Allowed Class 4 Claim, notwithstanding anything else herein, shall be in the amount of the "Indebtedness" as defined in the Restructuring Support Agreement and shall include TD Bank's pre-petition and post-petition attorney's fees and costs. Failure of the Debtor to execute the Renewal Note and such other additional loan documents (collectively, the "Renewal Loan Documents") as TD Bank deems reasonably necessary on or before the Effective Date shall be a default under the terms of the Plan. Except as otherwise agreed by the Debtor and TD Bank or as otherwise provided herein, the terms, conditions, and covenants in the Renewal Loan Documents shall be the same as the terms, conditions, and covenants in the existing loan documents and shall

also be in accordance with the terms of the Restructuring Support Agreement. The Debtor shall pay all of TD Bank's attorney's fees and costs related to drafting and closing on the Renewal Loan Documents and such amounts shall not exceed Ten Thousand Dollars ($10,000.00) and the failure to pay such amounts at closing shall be a default under the terms of the Plan. Unless otherwise expressly stated herein, the terms and conditions of the Restructuring Support Agreement remain in force between the Debtor and TD Bank until the closing on the Renewal Loan Documents, at which point the Renewal Loan Documents and this Plan shall supersede the Restructuring Support Agreement as the complete documentation of the agreements between the Debtor and TD Bank.

   3.  <u>Unsecured Claims</u>.

     a.  <u>Class 5 – Allowed Unsecured Claims</u>.

      Class 5 consists of all Allowed Unsecured Claims against the Debtor. In full satisfaction of their Allowed Unsecured Claims, Holders of Class 5 Claims shall receive quarterly payments under the Cash Flow Note, and the net proceeds of any Causes of Action after payment of all administrative expenses and post-Effective Date professional fees and costs. The Cash Flow Note will require quarterly payments for 48 months after the Effective Date equal to fifty percent (50%) of any surplus of the Reorganized Debtor's actual cash balance above the ending cash balance shown on the Projections, which payments shall be distributed pro rata to all Class 5 Claim Holders ("Cash Flow Payments"). The maximum Distribution under the Cash Flow Note shall be equal to the total amount of the Class 5 Claims, and no Class 5 Holder shall receive an amount greater than the amount of its Allowed Unsecured Claim. For purposes of determining Cash Flow Payments, the cash surplus shall be determined quarterly commencing on the first Business Day of the first calendar month after the Effective Date, and continuing each quarter thereafter.

Distributions of Cash Flow Payments shall be paid within thirty (30) days after the books have been closed for each applicable quarter.  Class 5 is Impaired.

       4.    <u>Equity Interests</u>.

       a.    <u>Class 6 – Equity in the Debtor</u>.

Class 6 consists of 100% of the membership interests in the Debtor. All Class 6 Interests shall be retained in the same proportion existing as of the Petition Date.  Class 6 is Unimpaired.

    C.    <u>Means of Implementation</u>.

       1.    <u>Business Operations and Repayment of Rent</u>.

The Plan contemplates that the Debtor will continue to manage and operate its business at the Retail Store.  The Debtor believes the cash flow generated by the Retail Store will be sufficient to make all Plan Payments and maintain existing operations, as established by the Projections.

       2.    <u>Funds Generated During Chapter 11</u>.

Funds generated from operations through the Effective Date will be used for Plan Payments; however, the Debtor's cash on hand as of Confirmation will be available for payment of Administrative Expenses.

       3.    <u>Management and Control of Reorganized Debtor</u>.

The operations of the Reorganized Debtor shall continue to be overseen by the Debtor's current officers, Mr. and Mrs. Jones.  The powers of the officers of the Reorganized Debtor shall be substantially the same as the manager's powers as of the Petition Date.

D.      Other Provisions.

1.      Leases and Executory Contracts.

The Plan provides the Debtor shall have through and including the Effective Date within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not rejected or subject to a filed motion to reject by such date, then such unexpired lease or executory contract shall be deemed assumed.  The Debtor's position is that the executory contracts listed on the Schedule of Executory Contracts filed pursuant to Rule 1007 are the only executory contracts to which the Debtor was a party as of the Petition Date, and there are no monetary or non-monetary defaults to cure.

2.      Procedures For Resolving Disputed Claims.

a.      Prosecution of Objections to Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtor shall have the exclusive right to make and file objections to all Claims, other than those claims deemed as "Allowed" under the terms of the Plan.  All objections commenced prior to the Confirmation Date shall be finished by the Reorganized Debtor.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made within 90 days after the Effective Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order, or any order in aid of Confirmation, shall

constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that either Debtor had immediately prior to the commencement of the Bankruptcy Cases against or with respect to any Claim or Equity Interest, with the exception of claims against any creditor who holds a stipulated and Allowed Claim under the Plan. Except as set forth in the Plan, upon Confirmation the Debtor shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that either Debtor had immediately prior to the commencement of the Bankruptcy Case as if the Bankruptcy Case had not been commenced.

b. <u>Estimation of Claims</u>.

Pursuant to the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim pursuant to § 502(c) of the Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates any contingent, disputed, or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

c.      <u>Cumulative Remedies</u>.

In accordance with the Plan, all of the aforementioned Claims objections, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  Until such time as an Administrative Claim, Claim, or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim, or Disputed Equity Interest for purposes related to allocations, distributions, and voting under the Plan.

d.      <u>Payments and Distributions on Disputed Claims</u>.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid by the Reorganized Debtor such that the Holder of such Allowed Claim receives all payments and distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in question.  Except as otherwise provided in the Plan, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of such dispute by settlement or Final Order.  Unless otherwise agreed to by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a distribution until such dispute is resolved by settlement or Final Order.

e.      <u>Allowance of Claims and Interests</u>.

(i)      <u>Disallowance of Claims</u>.

According to the Plan, all Claims held by entities against whom the Debtor has obtained a Final Order establishing liability for a cause of action under §§ 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Code ("Causes of Action") shall be deemed disallowed pursuant to § 502(d) of the Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that entity have been settled or resolved by a Final Order and all sums due the Debtor by that Entity are turned over to the Debtor. The Debtor reserves and shall have the exclusive right and authority to bring any Causes of Action before and after the Effective Date.

(ii)     <u>Allowance of Claims</u>.

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Bankruptcy Cases, unless and until such Claim or Equity Interest is deemed Allowed under the Code or the Bankruptcy Court enters a Final Order in the Bankruptcy Cases allowing such Claim or Equity Interest.

f.      <u>Controversy Concerning Impairment</u>.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan shall govern.

3.      <u>Effect of Confirmation</u>.

a.      <u>Authority to Effectuate the Plan</u>.

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides that all matters provided for under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order will act as an order modifying the Debtor's operating agreement, if so required, such that the provisions of this Plan can be effectuated. The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

b.      <u>Post-Confirmation Status Report</u>.

Pursuant to the Plan, within 90 days of the entry of the Confirmation Order, the Debtor will file a status report with the Bankruptcy Court attaching a detailed accounting of all payments made under the Plan and explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.      **CONDITIONAL INJUNCTION**.

A.      <u>Recipient</u>.

Mr. and Mrs. Jones (together, the "Guarantors") have been involved with the acquisition and development of the Debtor's property and business operations since its inception. As a consequence of their intricate involvement with the Debtor's business development and financial affairs, the Guarantors are obligated on numerous direct, limited, or conditional guarantees of the

Debtor's financial obligations, and as a result are liable under those contractual undertakings as accommodation parties for the Debtor or as direct obligors on account of credit obtained for the benefit of the Debtor on substantially all of the Debtor's business and operational indebtedness. Additionally, the Guarantors risk exposure to potential litigation related to claims arising from the Debtor's operations.  The Guarantors estimates their potential exposure on contractual recourse liability for the Debtor's business obligations and other Debtor related non-contractual claims may exceed $2,000,000.00.

The Debtor believes the Guarantors have contributed significant value to the Debtor's estate, and will continue to contribute value to the Reorganized Debtor.  In consideration of the substantial contributions made and to be made by the Guarantors, the Plan contemplates the granting of broad, conditional third-party injunctions of pursuit against the Guarantors for claims arising out of and deriving from the business operations and financial affairs of the Debtor.

B.    Conditional Injunction.

Debtor asserts the injunctions are being given as consideration for the accommodations provided by Guarantor under the Plan, and that the injunctions are fair consideration for property contributed and valuable services.

Except as expressly provided in the Plan, or to otherwise enforce the terms of the Plan, as of the Confirmation Date all Persons who have held, currently hold, or may hold a Claim, other debt or liability, an Interest or other right of an equity security that is impaired or terminated pursuant to the terms of the Plan, to the fullest extent permitted by applicable law, are enjoined from taking any of the following actions for so long as the Reorganized Debtor and the Guarantors are not

in default of any obligation under the Plan or any agreements contemplated by the Plan, on account

of any such impaired or terminated Claims, debts or liabilities, Interests or rights:

(i)    commencing or continuing in any manner any action or proceeding against the Guarantors or their property interests, other than to enforce any right pursuant to the Plan;

(ii)    enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Guarantors or their property interests, other than as permitted pursuant to (i) above;

(iii)    creating, perfecting, or enforcing any lien or encumbrance against the Guarantors or their property interests;

(iv)    asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Guarantors; and

(v)    commencing or continuing any action against the Guarantors, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

From and after the Confirmation Date, the Injunctions described in Article VIII,

Section T of the Plan and Article V herein shall become effective, and all Holders of Claims and

Interests shall be enjoined from commencing or continuing any of the actions detailed herein for so

long as the Reorganized Debtor and Guarantors remain in compliance with the Plan and any

agreements contemplated by the Plan, and except as specifically provided for in the Plan.

**VI.    CONFIRMATION**

A.    Confirmation Hearing.

Section 1128 of the Code requires the Bankruptcy Court, after notice, to hold a

Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in

opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without

further notice except for an announcement to be made at the Confirmation Hearing. Any objection

to Confirmation must be made in writing and filed with the Clerk, and delivered to the following

persons, at least seven (7) days prior to Confirmation Hearing:

> Counsel for the Debtor:
>
> Justin M. Luna, Esquire
> Latham, Shuker, Eden & Beaudine, LLP
> 111 N. Magnolia Ave., Suite 1400
> Orlando, Florida 32801
>
> Debtor:
>
> Tireco, Inc. d/b/a Formula Tire & Auto Care
> Attn. J. Michael Jones
> 2600 West State Road 434
> Longwood, Florida 32779
>
> United States Trustee:
>
> George C. Young Federal Building
> 400 West Washington Street, Suite 1100
> Orlando, Florida 32801

B.    Financial Information Relevant to Confirmation.

Attached as Exhibits to this Disclosure Statement, and incorporated herein, are the

following:

1.    A copy of Debtors' financial projections for the first three years of Plan

Payments, attached hereto as **Exhibit "A"** (the "Projections").  The Projections show that the

Debtor's operational cash flow will be sufficient to service the required Plan Payments at a debt level

as described herein using an anticipated Effective Date of **August 1, 2015**.  The projections and other

financial information have been provided by and prepared by the Debtor's president and vice

president, Mr. and Mrs. Jones.  The projections may not be relied upon as a guaranty or other

assurance of the actual results that will occur.  These projections are based upon a variety of

estimates and assumptions which may not be realized. The projections are based on assumptions existing as of May 2015 and have not materially changed; and

2.    **Exhibit "B"** is a copy of the Debtor's Chapter 7 liquidation analysis ("Liquidation Analysis") establishing that Creditors will receive under the Plan an amount not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7.

C.    Confirmation Standards.

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept the plan, that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in § 1129 of the Code have been met. The Debtor believes that the Plan satisfies all of the requirements for Confirmation.

1.    Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not

less than the amount that such holder would receive or retain if Debtor were, on the Effective Date, liquidated under Chapter 7 of the Code. The Debtor believes that satisfaction of this test is established by the Liquidation Analysis.

To determine what holders of Claims and Equity Interests would receive if the Debtor was liquidated, the Bankruptcy Court must determine how the assets and properties of the Debtor would be liquidated and distributed in the context of a Chapter 7 liquidation case. The Debtor's costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by the Debtor during the Bankruptcy Cases, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Bankruptcy Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

The Debtor has carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors, including the following:

a.      the possible costs and expenses of the Chapter 7 trustee or trustees;

b.      the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for the Debtor's assets caused by the forced Chapter 7 liquidation;

c.      the loss of the going-concern value of the Debtor's businesses; and

d.    the possible substantial increase in Claims, which would rank prior to or on a parity with those of Unsecured Creditors.

2.    <u>Financial Feasibility</u>.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtor unless the liquidation is proposed in the Plan.  The Debtor believes that core operations of the Reorganized Debtor, i.e. running and operating the Retail Store, will generate sufficient cash flow to make all Plan Payments noted herein.  Based on the projections, the Debtor asserts the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.

3.    <u>Acceptance by Impaired Classes</u>.

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section.  A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan.  Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under the Plan is deemed to have accepted the Plan; solicitation of acceptances with respect to such Class is not required.  A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder

of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any

default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that

on the Effective Date the holder of the Claim or Interest receives on account of such claim or

interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed

liquidation preference to which the holder is entitled.

        4.      <u>Confirmation Without Acceptance by all Impaired Classes: "Cramdown</u>."

        The Code contains provisions that enable the Bankruptcy Court to confirm the

Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has

been accepted by at least one Impaired Class of Claims.  Section 1129(b)(1) of the Code states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

        This section makes clear that the Plan may be confirmed, notwithstanding the

failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly,

and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not

accepted, the Plan.

        **THE DEBTOR BELIEVES THAT, IF NECESSARY, IT WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.      <u>Consummation</u>.

        The Plan will be consummated and Payments made if the Plan is Confirmed pursuant

to a Final Order of the Bankruptcy Court, the Effective Date occurs, and the Debtor or Reorganized

Debtor and applicable parties reach agreement on any required documents.  It will not be necessary for the Reorganized Debtor to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan.  The Plan will be implemented pursuant to its provisions and the Code.

      E.      <u>Exculpation from Liability</u>.

      The Debtor, the Reorganized Debtor, its member, Managers, officers, and directors, and its Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the plan or the Bankruptcy Case; *provided*, *however*, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.  With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Case.  The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the Reorganized Debtor, and their respective agents have or obtain pursuant to any provision of the Code or other applicable law, or any agreement.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a

release of any of the Causes of Action otherwise preserved by the Plan.  The terms of this

exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION.  MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN AND WHO HOLDS A CLAIM THAT MAY BE AFFECTED BY THIS EXCULPATION FROM LIABILITY PROVISION MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN NINETY (90) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Reorganized Debtor shall remain obligated to

make payments to Holders of Allowed Claims as required pursuant to the Plan, and (ii) the Debtor's

members, Managers, or executive officers shall not be relieved or released from any personal

contractual liability except as otherwise provided in the Plan.

F. <u>Police Power</u>.

Nothing in this Article V shall be deemed to effect, impair, or restrict any federal or

state governmental unit from pursuing its police or regulatory enforcement action against any person

or entity, other than to recover monetary claims against the Debtor for any act, omission, or event

occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to

§ 1141 of the Code.

G. <u>Revocation and Withdrawal of this Plan</u>.

The Debtor reserves the right to withdraw this Plan and Disclosure Statement at any

time before entry of the Confirmation Order.  If (i) the Debtor revokes and withdraws this Plan, (ii)

the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not

substantially consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall

be deemed null and void.

H.    <u>Modification of Plan</u>.

The Debtor may seek to amend or modify the Plan in accordance with § 1127(b) of the Code to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtor may issue, execute, deliver, or file with the Bankruptcy Court, or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

## VII.    <u>ALTERNATIVE TO THE PLAN</u>

If the Plan is not confirmed and consummated, the Debtor believes the most likely alternative is a sale of the Debtor's assets or a liquidation of the Debtor under Chapter 7 of the Code.  In a Chapter 7 liquidation or sale, there would be no assets to administer on behalf of unsecured creditors, and a Chapter 7 trustee would incur significant Administrative Expenses that would be paid before any distribution to creditors.  The Debtor therefore believes that liquidation of all real and personal property in a Chapter 7 case would dramatically reduce the total amount available to Creditors as compared to reorganization under the Plan.

## VIII.    <u>CONCLUSION</u>

The Debtor recommends that holders of Claims and Interests vote to accept the Plan.

**RESPECTFULLY SUBMITTED** this 16th day of June, 2015.

/s/ Justin M. Luna
Justin M. Luna, Esq.
Florida Bar No. 0037131
jluna@lseblaw.com
Christopher R. Thompson, Esq.
Florida Bar No. 0093102

cthompson@lseblaw.com
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
111 N. Magnolia Ave., Suite 1400
Orlando, Florida 32801
Tel: 407-481-5800
Fax: 407-481-5801
*Attorneys for the Debtor*

**EXHIBIT "A"**

Projections for Tireco, Inc.

Case No. 6:15-bk-03459-CCJ

| | Aug. 2015 | Sept. 2015 | Oct. 2015 | Nov. 2015 | Dec. 2015 | Jan. 2016 | Feb. 2016 | Mar. 2016 |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash WF | $ 25,000.00 | $ 26,056.00 | $ 30,723.00 | $ 42,982.00 | $ 54,799.00 | $ 57,556.00 | $ 69,345.00 | $ 83,272.00 |
| Sales | $ 108,000.00 | $ 103,000.00 | $ 108,000.00 | $ 108,000.00 | $ 101,000.00 | $ 108,000.00 | $ 110,000.00 | $ 110,000.00 |
| Total Cash | $ 133,000.00 | $ 129,056.00 | $ 138,723.00 | $ 150,982.00 | $ 155,799.00 | $ 165,556.00 | $ 179,345.00 | $ 193,272.00 |
| Advertising | $ 1,250.00 | $ 583.00 | $ 583.00 | $ 583.00 | $ 583.00 | $ 583.00 | $ 583.00 | $ 583.00 |
| Maintenance | $ 150.00 | $ 590.00 | $ 150.00 | $ 590.00 | $ 150.00 | $ 590.00 | $ 150.00 | $ 590.00 |
| Showroom | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| Insurance Auto | $ 485.00 | $ 485.00 | $ 485.00 | $ 485.00 | $ 485.00 | $ 500.00 | $ 500.00 | $ 500.00 |
| Electric | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 |
| Courier | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| Parts | $ 35,000.00 | $ 35,000.00 | $ 42,000.00 | $ 35,800.00 | $ 35,800.00 | $ 35,800.00 | $ 35,000.00 | $ 35,000.00 |
| Parts - COD | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 |
| Insurance Garage | $ 935.00 | $ 935.00 | $ 935.00 | $ 935.00 | $ 935.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 |
| Insurance Flood | | | | | | | | |
| Telephone/Internet | $ 600.00 | $ 600.00 | $ 600.00 | $ 600.00 | $ 600.00 | $ 600.00 | $ 600.00 | $ 600.00 |
| Uniforms | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 |
| Telecheck Fee | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| Tech Dues | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 |
| Insurance Life | $ 700.00 | | $ 248.00 | $ 700.00 | | $ 248.00 | $ 700.00 | |
| SC Tags | | | | | $ 150.00 | | | |
| Pure Water (Filtered) | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 | $ 50.00 |
| Water | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 |
| Payroll Gross | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 |
| Disposal Tires | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 | $ 350.00 |
| Storage | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 |
| P/R Fee | $ 217.00 | $ 217.00 | $ 217.00 | $ 217.00 | $ 217.00 | $ 217.00 | $ 217.00 | $ 217.00 |
| Office supplies | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 | $ 700.00 |
| Printing | | | | | | $ 500.00 | | |
| Misc. | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| Postage | $ 136.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 |
| T&E | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 |
| Parts/Brake Wash | $ 350.00 | | $ 350.00 | | $ 350.00 | | $ 350.00 | |
| Solid Waste Tax | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 |
| Garbage | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 | $ 125.00 |
| Health Ins | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 |
| Merchant Fees | $ 1,250.00 | $ 1,250.00 | $ 1,100.00 | $ 1,100.00 | $ 1,100.00 | $ 1,000.00 | $ 1,000.00 | $ 1,100.00 |
| Bank Chg | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 |
| Fuel | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 |
| Sales Tax | $ 6,900.00 | $ 6,900.00 | $ 6,900.00 | $ 6,100.00 | $ 6,100.00 | $ 6,100.00 | $ 6,900.00 | $ 6,900.00 |
| Total Ordinary Exp. | $ 90,753.00 | $ 89,442.00 | $ 89,550.00 | $ 89,992.00 | $ 89,352.00 | $ 90,020.00 | $ 89,882.00 | $ 82,472.00 |
| Plan Payments: | | | | | | | | |
| TD Bank | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 |
| Admin Claims | $10,000.00 | | | | | | | |
| Suntrust | $ 487.00 | $ 487.00 | $ 487.00 | $ 487.00 | $ 487.00 | $ 487.00 | $ 487.00 | $ 487.00 |
| SC Tang. Tax | | | | | | | | $ 480.00 |
| SC Prop. Tax | | $ 2,700.00 | | | $ 2,700.00 | | | $ 2,700.00 |
| FDOR Priority | $ 164.00 | $ 164.00 | $ 164.00 | $ 164.00 | $ 164.00 | $ 164.00 | $ 164.00 | $ 164.00 |
| TOTAL PLAN PAYMENTS | $ 16,191.00 | $ 8,891.00 | $ 6,191.00 | $ 6,191.00 | $ 8,891.00 | $ 6,191.00 | $ 6,191.00 | $ 9,371.00 |
| END CASH | $ 26,056.00 | $ 30,723.00 | $ 42,982.00 | $ 54,799.00 | $ 57,556.00 | $ 69,345.00 | $ 83,272.00 | $ 101,429.00 |

**Exhibit "A"**

Projections for Tireco, Inc.

Case No. 6:15-bk-03459-CCJ

| | Apr. 2016 | May.2016 | June.2016 | 3Q 2016 | 4Q 2016 | 1Q 2017 | 2Q 2017 | 3Q 2017 |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash WF | $ 101,429.00 | $ 113,258.00 | $ 126,845.00 | $ 126,122.00 | $ 163,065.00 | $ 125,926.00 | $ 158,469.00 | $ 170,982.00 |
| Sales | $ 108,000.00 | $ 110,000.00 | $ 108,000.00 | $ 325,000.00 | $ 325,000.00 | $ 325,000.00 | $ 325,000.00 | $ 325,000.00 |
| Total Cash | $ 209,429.00 | $ 223,258.00 | $ 234,845.00 | $ 451,122.00 | $ 488,065.00 | $ 450,926.00 | $ 483,469.00 | $ 495,982.00 |
| Advertising | $ 583.00 | $ 583.00 | $ 583.00 | $ 1,750.00 | $ 1,750.00 | $ 1,750.00 | $ 1,750.00 | $ 1,750.00 |
| Maintenance | $ 150.00 | $ 590.00 | $ 150.00 | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 |
| Showroom | $ 150.00 | $ 150.00 | $ 150.00 | $ 975.00 | $ 975.00 | $ 975.00 | $ 975.00 | $ 975.00 |
| Insurance Auto | $ 500.00 | $ 500.00 | $ 500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 |
| Electric | $ 700.00 | $ 700.00 | $ 700.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 |
| Courier | $ 100.00 | $ 100.00 | $ 100.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 |
| Parts | $ 35,000.00 | $ 35,000.00 | $ 42,000.00 | $ 105,000.00 | $ 105,000.00 | $ 110,000.00 | $ 125,000.00 | $ 120,000.00 |
| Parts - COD | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 | $ 6,000.00 |
| Insurance Garage | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 |
| Insurance Flood | | | $ 3,400.00 | | | | $ 3,900.00 | |
| Telephone/Internet | $ 600.00 | $ 600.00 | $ 600.00 | $ 1,800.00 | $ 1,800.00 | $ 1,800.00 | $ 1,800.00 | $ 1,800.00 |
| Uniforms | $ 350.00 | $ 350.00 | $ 350.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 |
| Telecheck Fee | $ 150.00 | $ 150.00 | $ 150.00 | $ 450.00 | $ 450.00 | $ 450.00 | $ 450.00 | $ 450.00 |
| Tech Dues | $ 500.00 | $ 500.00 | $ 500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 |
| Insurance Life | $ 248.00 | $ 700.00 | | $ 948.00 | $ 948.00 | $ 948.00 | $ 948.00 | $ 948.00 |
| SC Tags | 250 | | | | $ 150.00 | | $ 250.00 | |
| Pure Water (Filtered) | $ 50.00 | $ 50.00 | $ 50.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| Water | $ 80.00 | $ 80.00 | $ 80.00 | $ 240.00 | $ 240.00 | $ 240.00 | $ 240.00 | $ 240.00 |
| Payroll Gross | $ 31,375.00 | $ 31,375.00 | $ 31,375.00 | $ 94,115.00 | $ 94,115.00 | $ 94,115.00 | $ 94,115.00 | $ 94,115.00 |
| Disposal Tires | $ 350.00 | $ 350.00 | $ 350.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 | $ 1,050.00 |
| Storage | $ 125.00 | $ 75.00 | $ 75.00 | $ 225.00 | $ 275.00 | $ 225.00 | $ 225.00 | $ 225.00 |
| P/R Fee | $ 217.00 | $ 217.00 | $ 217.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 | $ 650.00 |
| Office supplies | $ 700.00 | $ 700.00 | $ 700.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 |
| Printing | | | | $ 500.00 | | | | $ 500.00 |
| Misc. | $ 100.00 | $ 100.00 | $ 100.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 |
| Postage | $ 102.00 | $ 102.00 | $ 102.00 | $ 306.00 | $ 306.00 | $ 306.00 | $ 306.00 | $ 306.00 |
| T&E | $ 500.00 | $ 500.00 | $ 500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 |
| Parts/Brake Wash | 350 | | 350 | 350 | 350 | 350 | 350 | 350 |
| Solid Waste Tax | $ 300.00 | $ 300.00 | $ 300.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 |
| Garbage | $ 125.00 | $ 125.00 | $ 125.00 | $ 375.00 | $ 375.00 | $ 375.00 | $ 375.00 | $ 375.00 |
| Health Ins | $ 4,800.00 | $ 4,800.00 | $ 4,800.00 | $ 14,400.00 | $ 14,400.00 | $ 14,400.00 | $ 14,400.00 | $ 14,400.00 |
| Merchant Fees | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 3,300.00 | $ 3,400.00 | $ 3,200.00 | $ 3,600.00 | $ 3,500.00 |
| Bank Chg | $ 75.00 | $ 75.00 | $ 75.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| Fuel | $ 300.00 | $ 300.00 | $ 300.00 | $ 900.00 | $ 900.00 | $ 900.00 | $ 900.00 | $ 900.00 |
| Sales Tax | $ 6,900.00 | $ 6,900.00 | $ 6,900.00 | $ 18,000.00 | $ 18,000.00 | $ 18,000.00 | $ 18,000.00 | $ 18,000.00 |
| Total Ordinary Exp. | $ 89,980.00 | $ 90,222.00 | $ 99,832.00 | $ 266,784.00 | $ 266,584.00 | $ 271,184.00 | $ 290,734.00 | $ 281,984.00 |
| **Plan Payments:** | | | | | | | | |
| TD Bank | $ 5,540.00 | $ 5,540.00 | $ 5,540.00 | $ 16,620.00 | $ 16,620.00 | $ 16,620.00 | $ 16,620.00 | $ 16,620.00 |
| Admin Claims | | | | | | | | |
| Suntrust | $ 487.00 | $ 487.00 | $ 487.00 | $ 1,461.00 | $ 1,461.00 | $ 1,461.00 | $ 1,461.00 | $ 1,461.00 |
| SC Tang. Tax | | | | | | | 480 | |
| SC Prop. Tax | | | 2700 | 2700 | 2700 | 2700 | 2700 | 2700 |
| FDOR Priority | $ 164.00 | $ 164.00 | $ 164.00 | $ 492.00 | 492 | 492 | 492 | 492 |
| TOTAL PLAN PAYMENTS | $ 6,191.00 | $ 6,191.00 | $ 8,891.00 | $ 21,273.00 | $ 6,740.00 | $ 21,273.00 | $ 21,753.00 | $ 21,273.00 |
| END CASH | $ 113,258.00 | $ 126,845.00 | $ 126,122.00 | $ 163,065.00 | $ 214,741.00 | $ 158,469.00 | $ 170,982.00 | $ 192,725.00 |

EXHIBIT "A"

Projections for Tireco, Inc.
Case No. 6:15-bk-03459-CCJ

| | 4Q 2017 |
|---|---|
| Beginning Cash WF | $ 192,725.00 |
| Sales | $ 325,000.00 |
| | |
| Total Cash | $ 517,725.00 |
| | |
| Advertising | $ 1,750.00 |
| Maintenance | $ 1,250.00 |
| Showroom | $ 975.00 |
| Insurance Auto | $ 1,500.00 |
| Electric | $ 2,100.00 |
| Courier | $ 250.00 |
| Parts | $ 120,000.00 |
| Parts - COD | $ 6,000.00 |
| Insurance Garage | $ 3,000.00 |
| Insurance Flood | |
| Telephone/Internet | $ 1,800.00 |
| Uniforms | $ 1,050.00 |
| Telecheck Fee | $ 450.00 |
| | |
| Tech Dues | $ 1,500.00 |
| Insurance Life | $ 948.00 |
| SC Tags | $ 150.00 |
| Pure Water (Filtered) | $ 150.00 |
| Water | $ 240.00 |
| Payroll Gross | $ 94,115.00 |
| Disposal Tires | $ 1,050.00 |
| Storage | $ 275.00 |
| P/R Fee | $ 650.00 |
| Office supplies | $ 1,500.00 |
| Printing | |
| Misc. | $ 300.00 |
| Postage | $ 306.00 |
| T&E | $ 1,500.00 |
| Parts/Brake Wash | 350 |
| Solid Waste Tax | $ 1,200.00 |
| Garbage | $ 375.00 |
| Health Ins | $ 14,400.00 |
| Merchant Fees | $ 3,400.00 |
| Bank Chg | $ 150.00 |
| Fuel | $ 900.00 |
| Sales Tax | $ 18,000.00 |
| Total Ordinary Exp. | $ 281,584.00 |
| | |
| | |
| Plan Payments: | |
| TD Bank | $ 16,620.00 |
| Admin Claims | |
| Suntrust | $ 1,461.00 |
| SC Tang. Tax | |
| SC Prop. Tax | 2700 |
| FDOR Priority | 492 |
| TOTAL | |
| PLAN PAYMENTS | $ 21,273.00 |
| | |
| | |
| END CASH | $ 214,868.00 |

<u>**EXHIBIT "B"**</u>

**Tireco, Inc.**
**Case No. 6:15-bk-03459-CCJ**

**LIQUIDATION ANALYSIS**

| <u>Asset</u> | <u>Estimated Liquidation Value as of August 1, 2015</u> |
|---|---|
| Cash | $              25,000.00[1] |
| Personal Property | $              70,000.00[2] |
| Real Property | $        $737,600.00[3] |
| **TOTAL LIQUIDATION** | $              **832,600.00** |
| Unsecured Claims | $              269,839.35 |
| Secured Claims | $              940,642.41 |
| Potential Unsecured Deficiency Claims | $              118,042.41[4] |
| Administrative Chapter 7 | $              10,000.00 |
| Administrative Chapter 11 | $              20,000.00 |
| Priority and Secured Tax Claims | $              11,288.91 |
| **TOTAL SECURED AND ADMINISTRATIVE CLAIMS** | $        **$981,931.32** |
| AVAILABLE FOR GENERAL UNSECURED CREDITORS | $              $0.00 |
| PAYOUT UNDER CHAPTER 7 | 0% |
| PAYOUT UNDER THE PLAN | Proceeds of Causes of Action and quarterly payments under Cash Flow Note |

---

[1] Cash is encumbered by the first priority lien of TD Bank.
[2] Assumes forced-sale liquidation of the Personal Property and no net recovery of potential preference claim.
[3] Assumes forced sale liquidation of the Real Property, using a discount factor of 33%.
[4] Estimate based on the estimated liquidation value of the Real Property.